## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**UNITED STATES OF AMERICA**

**vs.**                                      **3:10mj41/MD**

**MICHAEL D. ATKINSON, and**
**MICHAEL D. ATKINSON, JR.**

---

### WRITTEN FINDING OF FACTS, CONCLUSIONS OF LAW,
### and FINDING OF NOT GUILTY

"**From Little Things Big Things Grow.**"[1]  That simple idea recently played out with such intensity that a series of Little Things comprised of some aggravations, some misunderstandings, and some overreactions, compounded by fragile tempers, and some degree of arrogance on one side and disregard for some simple rules on the other resulted in the making of a federal case, the prosecution of two citizens and the expenditure of significant time and energy, not to mention expense, by the government, the public defender, and the court.  Having heard the evidence I find that the defendants, Michael D. Atkinson and Michael D. Atkinson, Jr. are not guilty of the one count Information against them.  But that is not the whole story.

---

[1]Title of a 1991 song by Paul Kelly and Kev Carmody referring to a small strike that led to protests resulting eventually in giving indigenous people freehold title to traditional lands in the Northern Territory of Australia.

## THE CHARGES and THE LAW

A single count information charged that defendants **Michael D. Atkinson and Michael D. Atkinson, Jr. did interfere, threaten, resist, intimidate, and intentionally interfere with a government employee or agent engaged in an official duty, and on account of the performance of an official duty in violation of Title 36, C.F.R. section 2.32(a)(1). (Doc. 1). The language of the regulation actually is stated in the disjunctive:**

**(a) The following are prohibited:**

> **(1) Interference. Threatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty.**

**36 C.F.R. § 2.32. However, this is not a distinction of consequence, because "[w]here the language of a statute proscribes several means by which the defendant might have committed a violation, the government may plead the offense conjunctively and satisfy its burden of proof by any of the means."** *United States v. Cornillie*, **92 F.3d 1108, 1110 (11th Cir. 1996) (***United States v. Burton***, 871 F.2d 1566, 1573 (11th Cir. 1989));** *see also United States v. Morales-Martinez*, **496 F.3d 356, 358 (5th Cir. 2007) ("[a] disjunctive statute may be pleaded conjunctively and proven disjunctively") (citing** *United States v. Still*, **102 F.3d 118, 124, (5th Cir. 1996)). Thus, to prove its case, the government was required to prove beyond a reasonable doubt that the defendants threatened or resisted or intimidated or intentionally interfered with a government employee or agent engaged in an official duty or on account of the agent's performance of an official duty. This may be done by showing, for instance, a repeated refusal to provide identification, when requested** *United States v. Cortesi*, **2008 WL 4966754 (E.D. Cal. 2008); failure to follow a Ranger's commands,** *United States v. Willfong*, **274 F.3d 1297 (9th Cir. 2001),** *United States v. Bass*, **82 F.3d 811, 812 (8th Cir. 1996); or ripping up and otherwise failing to heed a citation***, United States v. Meryam Zislovich,* **Fed. Appx. 607, 2005 WL 2250741 (9th Cir. 2005).**

Force is not a required element of interference. *Willfong*, 274 F.3d at 1302-1303. In fact, very little is required. By way of illustration, in *United States v. Bass*, the defendant was convicted of violation § 2.32(a)(1) after disobeying a ranger's order during a traffic stop to stay at the rear of his vehicle. 82 F.3d at 812. The defendant appealed to the district court, challenging the magistrate judge's decision. The district court affirmed, noting that the traffic stop "would not have lasted long but for [defendant's] unwillingness to follow some simple commands" and finding that the defendant's resistance of those commands violated the regulation. *Id.* The Eighth Circuit affirmed, finding that the legal conclusion that defendant violated the regulation was compelled by the magistrate judge's finding that he failed to stand at the rear of his vehicle when told to do so and also that he moved about in a violent manner. *Id.*

In *United States v. Willfong*, the Ninth Circuit held, over a strong dissent, that the defendant's failure to obey a forest officer's order constituted "interference" with the officer as a matter of law, and that defendant's failure to use physical force to do so was irrelevant. 274 F.3d at 1301-1302. The regulation in question was 36 C.F.R. § 261.3(a), and the order in question was an order to desist logging operations on Forest Service Land. Defendant politely refused to shut down his operations under threat of arrest, and after his arrest, he told his crew to continue working. The *Willfong* court cited several state law cases for the proposition that failure to obey an order was sufficient to rise to the level of "interference." See *State v. Boone*, 243 Ga. 416, 254 S.E.2d 367 (1979), *cert. denied*, 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979) (refusal to obey order to vacate building constitutes interference); *Ratliff v. State*, 133 Ga.App. 256, 211 S.E.2d 192 (1974) (refusal to obey order to stop attempting to enter a premises being searched constitutes interference); *City of Chicago v. Lynd*, 47 Ill.2d 205, 265 N.E.2d 116 (1970), cert. denied, 402 U.S. 923, 91 S.Ct. 1383, 28 L.Ed.2d 662 (1971) (refusal to obey order to clear the street constitutes interference); *State v. Manning*, 146 N.J.Super. 589, 370 A.2d 499 (App.Div.1977) (refusal to obey order to re-enter vehicle constitutes interference); *Township of East*

*Brunswick v. Malfitano*, 108 N.J.Super. 244, 260 A.2d 862 (App.Div.1970) (refusal to obey order to provide one's name and address constitutes interference). The dissent argued that the meaning of interfere adopted by the majority was equivalent to criminalizing "failure to obey an officer," which was contrary to the plain meaning of the word interfere and "at war with the regulations read as a whole." 274 F.3d at 1305 (Noonan, C.J., dissenting).

## FINDINGS OF FACT

In August, 2009 the Atkinson family, residents of Gulf Breeze, Florida, went camping at the nearby Ft. Pickens area of the Gulf Islands National Seashore. The park had been closed for several years due to damage from Hurricane Ivan, and had just recently reopened. Mrs. Kathleen Atkinson (Kathy) and her older son, defendant Michael David Atkinson, Jr. (David) drove to Ft. Pickens on the evening of Thursday, August 13, 2009. Kathy drove the family vehicle pulling a pop-up camper. David, who was then 19 years old, drove his own car. They arrived at the park after the office at the front gate had closed although the gate was open for late-arriving campers. Kathy and David proceeded to campground loop E and set up their camper in space E-52. Kathy asked David to go to town to get groceries and to bring back his younger brother, John.

Eighteen year old John, driving his own car, followed by David in his, entered the park at around 9:30 that night. As they were driving through a series of sharp curves at low speed an approaching vehicle moved over into their lane, forcing John off the road. The oncoming vehicle was a park ranger's marked SUV driven by Law Enforcement Ranger Larry Edwards. Ranger Edwards was on routine patrol. There had recently been some vandalism in the park and he was checking to see if people had legitimate reasons for being in the park. John told the ranger that he was camping but did not know where. Suspicious, Ranger Edwards told him he would be checking on him later. David had stopped behind John, but could hear only what he described as loud voices. He was not questioned. David and John proceeded to

the camping area.  John was unnerved by his encounter with Ranger Edwards.  He told his mother that Ranger Edwards, who he described as a large black man, had harassed and intimidated him.  The next morning John decided that he did not want to stay in the park.  John's encounter with Ranger Edwards was the first Little Thing.

Another Little Thing: It is hot and humid on the Gulf Coast in August, and Kathy and her sons spent an uncomfortable Thursday night.  They were not allowed to use their generator according to park rules, so they had no air conditioning.  However, all night they listened to generators somewhere in the distance because workers were still in the park doing repairs and they apparently were allowed to run generators although campers were not.  Kathy thought this was particularly unfair because the camping area was virtually empty but for the Atkinsons.  The campers did not get a good night's sleep.

The next morning, Friday, John went home.  "Ranger Jim" came by and told Kathy that the wheels of her camper were off the pavement and it had to be moved.  She had not realized this because she had set up after dark.  Ranger Jim also told her that David's car should not be parked in the adjacent slot, E-50, because it had not been paid for.  He explained that there was overflow parking nearby, and that David should park there.  Defense Exhibit 6 shows that there was parking available approximately ten or twelve camping spaces away from the Atkinson's space.  Ranger Jim was not specifically identified as a park employee, nor was his uniform, if he wore one, described.  The rangers who testified referred to him as a "Visitor Use Assistant."  It is unclear whether he was actually a park employee.  It makes no difference.  He took no official action.  He simply reminded Kathy of the rules and gave her a "Compliance Notice" form that identified camping space E-52 and a Florida license plate.  He checked a box on the form that stated "Vehicles must be parked completely on the pavement or parked in the extra vehicle parking area." (Def. Ex. 9).  Kathy moved the camper onto the pavement although she felt it was an imposition because the wheels were barely off the pavement and were resting on sand, not vegetation.  David's car was not moved.

Another Little Thing: Fire ants (*solenopsis invicta*) are endemic to the Gulf Coast. They live in large mounds and are very aggressive if disturbed, stinging *en masse*. While their stings are only mildly painful, they leave lingering welts and can cause considerable itching. At some point on Friday, Kathy stepped in a fire ant bed and had multiple stings on her feet. That evening defendant Michael David Atkinson (Michael) arrived at the camping area with daughter Rose. The family spent another hot, miserable night listening to generators and getting little sleep. The Little Things were compounding into a Major Aggravation.

Saturday morning Michael found someone looking into the camper. It was Ranger Jim, who again explained that David's car should not be parked in the adjacent, unpaid-for space. Michael said he would be happy to pay for the extra space since there was nobody else in the camping area. Another Little Thing was added when Ranger Jim gave Michael a Compliance Notice (which he had apparently already filled out) on which he had checked the box concerning parking, and written on the back: "Good Morning. As I told you yesterday, extra vehicles must be parked in the overflow area."

Every year the Pensacola area holds a Fiesta of Five Flags celebration, marking the original settlement of Pensacola by Don Tristan DeLuna in 1559. It happened that the celebration took place the week-end the Atkinsons were camping, and 2009 was the 350th anniversary of that event. DeLuna's landing took place on Pensacola Beach not far from the park, and that Saturday there was a special Mass planned to be held in an area just outside the park gate. The King and Queen of Spain had come to Pensacola. The Atkinson family had ancient ties to some of the original inhabitants of the area, and the Atkinsons had all planned to attend the Mass. Kathy decided she had endured enough misery and wanted to go home, so she stayed to pack up everything while Michael, David and Rose went to Mass. On the way out of the park to Mass, they did not bother to stop by the ranger station to pay for the space where David's car was parked.

Saturday morning Law Enforcement Ranger Taylor[2] received a call that there appeared to be a continuing violation at the Atkinson campsite and was directed to investigate. She proceeded to the site in her marked SUV. She also asked for back-up, and Ranger Edwards responded. Ranger Edwards had just finished investigating an abandoned campsite in a nearby loop where had he found some marijuana, paraphernalia and alcohol, which he had placed in the passenger seat of his vehicle. He pulled up behind Ranger Taylor's vehicle just after she arrived.

Kathy was sitting with her ant-stung feet in ice water when the two rangers approached. Ranger Taylor asked for some identification. Kathy thought her purse was in the camper and started to enter. Ranger Taylor, who was wearing a uniform with body armor and a handgun at her hip told Kathy she could not enter the camper alone. Kathy was incensed that this ranger with a gun on her hip would think she, the ranger, would be allowed to enter the camper. But Ranger Taylor did not know the Atkinsons, knew nothing about what might be going on, and was concerned for her safety. Kathy was finally allowed to pull up a section of the tenting and could see that her purse was not where she thought it was. She asked if she could call her husband and was allowed to do so.

Counsel for the defendants pooh-poohed the entire issue of officer safety. What danger could Kathy possibly offer, they asked, dressed in shorts and a T-shirt, when there were two heavily armed rangers there? But they know better. Law enforcement officers have dangerous jobs and are always on the alert for surprises. They are targets for criminals and know that deaths result from carelessness. There had been mischief in the park, drugs had been found nearby, and even if Ranger Taylor was not aware of the drugs, Ranger Edwards was. Neither of the rangers knew that the Atkinsons came from a long-established, law abiding family in the

---

[2]Ranger Taylor's name was Lanshe at the time of the events in question.

Pensacola area that had traveled the country staying in National Parks.  They just knew there was an alleged violation and they were trying to get to the bottom of it.[3]

Unfortunately, they got no cooperation from Kathy.  She wanted to know if Ranger Edwards was the one who had harassed her son two nights before.  She demanded his name and badge number.  She was not interested in discussing David's car.  She was upset at the way the family had been treated.  She was frustrated by the heat, the fire ants, the parking rules, park fees, and what she perceived as the repeated hassling by rangers.  Ranger Edwards responded in kind, only worse.  He was there for back-up but his partner was not getting any cooperation.  He finally lost his temper.  He got in Kathy's face.  Kathy got in his face.  Discussion ensued; heated discussion followed; courtesy evaporated; accusations flew.

Michael and his son and daughter had just arrived in the area where the Mass was to be held when he got the call from his wife, who was agitated and shaken up.  Michael turned around and headed for the campsite.  When he arrived he saw his wife face to face with a tall, muscular, black ranger who was shaking his finger in Kathy's face.  Michael pulled his wife back and demanded to know what was going on.  Ranger Edwards told Michael to stay back and shut up or he would be arrested.  Michael protested that he was doing nothing wrong, and was trying only to protect his wife, and mentioned the incident between Edwards and John on Thursday night.  Michael said something to the effect that Ranger Edwards was a disgrace to his uniform, and that President Obama would be proud of him.  Ranger Edwards understandably took this as a racial slur.  Ultimately the shouting and yelling and threatening behavior escalated to the point that Michael claimed to have actually feared that his family was going to be beaten.  I do not believe that for a minute.  Cool heads and adult behavior were simply in short supply.  Ranger Edwards is

---

[3]And both testified that safety was at least a question in their minds as the situation escalated.

indeed a large man, but fear was not driving Michael. At that point he was just returning anger.

Michael told David to get his cell phone and start video taping what was happening. David complied, staying back far enough to get everyone in the viewfinder. He also walked around the two rangers' vehicles, video taping their licence plates. He video taped the interior of Ranger Taylor's vehicle (the windows were up), and at some point was told to move away from the vehicle. He then started to do the same at Ranger Edwards' vehicle. The driver's side window was open, and David was shocked to see what he referred to as a huge amount of artillery in the vehicle. There was a fully automatic assault rifle with extra magazines and a combat shotgun with extra shells. He wanted to get that on video, and, as he explained it, put the whole episode on You Tube.[4]

Ranger Edwards looked over and saw David by his vehicle. He could see only David's back, but it appeared that David was leaning into the vehicle reaching for something. Mindful that there was drug contraband as well as weapons in the vehicle, Ranger Edwards shouted "Enough!" and ran over and grabbed the camera phone just as David turned toward him. In the process of grabbing the phone Ranger Edwards somehow made a small scrape on David's nose.

Michael shouted that Ranger Edwards had now committed a battery and a theft, the shouting increased yet again, and Michael finally asked if the family could just leave. Ranger Edwards responded that if the family did not leave the park they would be thrown out. Packing up did not ease the tension. Ranger Edwards got in Michael's way as he tried to carry things to his car. Michael got in Ranger Edwards'

---

[4] A popular web site for self-publication of video recordings.

way as he tried to walk around the area. Ultimately Ranger Taylor cited Michael and David for the crimes now under consideration,[5] and the family left.

Michael called somebody he knew in the Park Service and asked that District Ranger Norris call him. Ranger Norris called. Michael explained what had happened and asked that David's phone be returned. David worked offshore, he had to stay in touch with his employer, and if he missed a call to go back to work he could lose his job. Ranger Norris called back later that evening. He explained that Ranger Edwards had not left the park yet and promised to drop the phone off at the Atkinson home when he received it, which he did later that evening. When he received the phone Michael told Ranger Norris that the proof of what happened was in the phone, and Ranger Norris said he would like to get a copy of whatever was there. Michael said he would think about it. A few days later Michael called Ranger Norris and asked if he could sit down with the family, perhaps for lunch. They all met for lunch soon thereafter. The family members said they were still traumatized by the events. Ranger Norris was apologetic without making any admissions. Nothing else of substance was said. Ranger Norris again said he would like to get a copy of whatever was on the video, and Michael said he would think about it. Kathy said that she had 12 pages of notes about the experience that Ranger Norris also said he would like to see, but never received. A month or so later an article telling the Atkinsons' side of the story appeared in the local newspaper.[6] Ranger Norris yet again asked for a copy of the video but was rebuffed.

At the time of the incident, David's phone was brand new. David testified that when he received it back the evening of the incident the case was scratched and

---

[5]Taylor testified that Michael impeded her in dealing with Kathy, he failed to cooperate, he would not be quiet and she had to tell him to back off so she could finish. I do not fully credit this testimony. Taylor testified on direct that David refused to provide identification when asked to do so, although on cross she said that he did show her his driver license. David apparently kept walking amidst the individuals present, although his comments did not reach the verbal intensity of those of his father or mother.

[6]The article was not introduced in evidence, and I have not seen it.

dirty. The memory stick had been removed and the functions wiped. The phone did not work at all, and nothing was ever retrieved from it. Although I have difficulty believing the phone was returned in that condition, whether that is true need not be decided. After a few months, and having heard nothing further about the citations, David felt like the incident was over and he disposed of the phone. Not long thereafter he and his father received notice from the Civilian Violation Bureau that they must appear in court in February, 2010. Unfortunately, for whatever reason, the fact of the phone's alleged destruction was not revealed when it was discovered on the day it was returned, either to law enforcement or to an independent expert, so no true forensic examination was done. Had the condition of the phone been immediately brought to the attention of someone in authority, the evidence would be clear: events occurred exactly as the Atkinsons testified, or exactly as the rangers testified, or somewhere in between (as I have found above). If in fact the phone was effectively destroyed, this was done under the most suspicious possible circumstances. This is doubtful. David did not testify that he told anyone with the Park Service, or any branch of law enforcement, that his phone had been tampered with. He was not asked about it. Finally, I find no reason to disbelieve Ranger Norris, who said he was never told the phone was destroyed, only that the Atkinsons would "think about" giving him a copy of whatever was on it.

John's alleged brutalization at the hands of Ranger Edwards - so much so that John said he would never return to a national park - was more imagined than real. John may indeed have felt like he was being harassed, but Ranger Edwards had good reason to stop him. The first Little Thing became bigger when John magnified his fear in relating it to his mother. The drama would have ended there, however, had the Atkinsons only parked as they were told, or had Michael paid for the extra spot as he said he would. There would have been no more visits from Ranger Jim, and the law enforcement rangers would never have entered the picture. This does not excuse any overreaction on the part of Ranger Edwards, or any failure to intervene on the part of Ranger Taylor, or the alleged destruction of the telephone,

if that happened, but in the end the Atkinsons became victims of their own disregard for the rules.

## CONCLUSION

The court is reminded of some simple truths that were highlighted through the sequence of events giving rise to this case that bear specific mention here. Generally, people, including the defendants, are not as important as they think they are. An individual's version of events is usually not entirely true, no matter how passionately she or he believes it and no matter what badge of authority she or he wears. And, people would do well to consider that rules are in place for the good of the public, not targeted at inconveniencing certain individuals, and they may not be selectively obeyed. Parking on sand prevents vegetation from growing. Vegetation is what holds the island together. Once may do no harm, but the rangers justifiably seek to prevent it every time.

There is a difference between law enforcement rangers and a ranger who guides tours in a park, and it is easy to tell the difference. Law enforcement officers, as well as citizens under investigation, deserve courtesy, which I find to have been seriously lacking on both sides. Law enforcement officers also have the right to treat anyone they encounter, particularly an unknown person under unknown circumstances, with some degree of suspicion. That fact alone does not make them unprofessional. They are rightly concerned for their safety. Furthermore, having weapons in a law enforcement vehicle is the rule, not the exception, and trumpeting a misunderstanding of that fact on the internet would be a disservice.

The testimony in this case was diametrically opposed, and I do not fully credit the version presented by either the government or the defense. Ranger Edwards was initially present for purposes of back-up. By the time Michael and David arrived, however, Ranger Taylor had inexplicably faded into the background, and Ranger Edwards had effectively abandoned the pretense of official duty when he lost his temper in response to the lack of cooperation he encountered from Kathy, who was

not charged.  Ranger Taylor apparently did not try to de-escalate the situation; her only involvement at that point was writing the two citations at issue here.

Nobody (other than Rose, who stayed out of it), was innocent here.  But the issue at hand is not whether, in hindsight, the defendants acted in a civil or appropriate manner, which they did not, but whether the government proved beyond a reasonable doubt that they violated the regulation as charged.  From the testimony presented at trial, I have no difficulty concluding that David was not guilty.  Michael's behavior presents a much closer question.  Nonetheless, I find that the government has not proved beyond a reasonable doubt that either Michael or David interfered, threatened, resisted, intimidated, or intentionally interfered with a government employee or agent engaged in an official duty, or on account of the performance of an official duty in violation of Title 36, C.F.R. section 2.32(a)(1).

I therefore find the defendants NOT GUILTY.

DONE AND ORDERED this 29th day of April, 2010.

/s/ *Miles Davis*
MILES DAVIS
UNITED STATES MAGISTRATE JUDGE